IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 10, 2017 Session

## THE COAL CREEK COMPANY v. ANDERSON COUNTY, TENNESSEE, ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 190298-1     John F. Weaver, Chancellor**

_____

**No. E2017-00661-COA-R3-CV**

_____

This appeal concerns whether a tax on certain property containing oil and gas deposits constitutes an unlawful additional severance tax. The Coal Creek Company ("Coal Creek") appealed the tax assessments of various county property assessors ("Assessors"). After administrative proceedings and appeals, the Tennessee Assessment Appeals Commission reinstated the original assessments. Coal Creek filed suit in the Chancery Court for Knox County ("the Trial Court") seeking judicial review of the Appeals Commission's decision. Following a bench trial, the Trial Court entered an order dismissing Coal Creek's complaint. Coal Creek appeals to this Court. We hold, _inter alia_, that the taxes assessed upon Coal Creek's property relative to oil and gas remaining in the ground are property taxes, not a severance tax. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Lewis S. Howard, Jr. and Erin J. Wallen, Knoxville, Tennessee, for the appellant, The Coal Creek Company.

Robert T. Lee, Mt. Juliet, Tennessee, for the appellee, Anderson County, Tennessee.

Joseph G. Coker, Jacksboro, Tennessee, for the appellee, Campbell County, Tennessee.

Andrew N. Hall, Wartburg, Tennessee, for the appellee, Morgan County, Tennessee.

John Sharpe, Assistant General Counsel for the appellee, Tennessee Division of Property Assessments.

Herbert H. Slatery, III, Attorney General and Reporter, Andrée Sophia Blumstein, Solicitor General, and, Mary Ellen Knack, Senior Counsel, for the appellees, State Board of Equalization and Assessment Appeals Commission.

## OPINION

## Background

Coal Creek owns the subject real property in Anderson, Campbell, and Morgan Counties. This property contains oil and natural gas deposits, which Coal Creek also owns in fee simple. The majority of Coal Creek's oil and gas operations are centered in Anderson County, Tennessee. Coal Creek receives royalty payments from lessees who remove the oil and gas. This case has its origin in a 2009 change in how the Coal Creek property was classified for tax purposes. Before 2009, Coal Creek's property had been classified as farm property and assessed at a 25% rate. Beginning in 2009, the Assessors assessed the property's mineral value at the industrial or commercial rate of 40%. From 2009 through 2014, Coal Creek paid these additional taxes to Anderson County in the amount of $122,742.59; Morgan County in the amount of $27,408; and, Campbell County in the amount of $1,662. The Tennessee Division of Property Assessments assisted the Assessors in their work valuing the mineral interests. An income approach was utilized in the valuations.

Coal Creek appealed the assessments to the State Board of Equalization. In October 2013, Coal Creek filed a motion for summary judgment. In January 2014, the Administrative Judge entered an initial decision and order granting Coal Creek's motion for summary judgment. In finding for Coal Creek, the Administrative Judge stated in part:

> The Administrative Judge finds that the Assessors' methodology for estimating the contributory value of the oil and gas reserves does not comport with Tenn. Code Ann. § 67-5-602(a) insofar as the dictates of the Assessment Manual have been ignored. For example, the portions of the depositions summarized or quoted above make clear that the Assessors have no knowledge of, and make no meaningful attempt to obtain, information concerning the quantity of the reserves and the remaining economic life of the reserves. Moreover, no attempt is made to obtain information from the operator concerning its plans, income from royalties etc.

-2-

***

The Assessors have absolutely no information to support the assumption that the prior year's production is a reliable indicator of future production. Indeed, if a producer chooses to cease production for a year in hopes that the price of oil and gas will increase, the Assessors would assign no value to the oil and gas reserves for the current year because of no production the prior year. This valuation method quite clearly results in nothing more than an additional severance tax on oil and gas production that is purported to be an *ad valorem* tax on property containing oil and gas reserves. Consequently, the Assessors' methodology for valuing the mineral component of subject parcels violates the prohibition in Tenn. Code Ann. § 60-1-301 against taxing oil and gas removed from the ground except for a severance tax as set forth in that statutory provision.[1]

(Footnote added). In February 2014, the Tennessee Division of Property Assessments, acting on behalf of the counties, appealed the Administrative Judge's decision to the Tennessee Assessment Appeals Commission. In April 2015, a hearing was conducted before the Appeals Comission.

Keith Gibson, an area supervisor for the Tennessee Division of Property Assessments, testified regarding the methodology used in valuing mineral interests:

I've been with the Division for 32, 33 years, started doing the mineral valuation probably in 2006 or 7. I had done it previously years ago as a young staff member that basically just plugged in a few numbers but just kind of took over this aspect of it in 2007 or 8. Since that time, I have been promoted up to supervisor, the current position that I'm in. I have not been directly involved with these appraisals, but I oversee each and every one of them. Therefore, I have the most knowledge.

But what we're trying to do is, we contend that it's not a severance tax, that all we're doing is just valuing an income stream. If you take two like properties, exactly like Mr. Howard suggested awhile ago, where you have a property that does not have a known mineral reserve and then you have another one that does, all we're doing is just looking at the royalty that they received from that one year and then projecting a lifetime in saying, you know, what is that income stream worth over a period of time. If you

---

[1] Ad valorem is Latin for "according to the value," or as meant specifically in this instance, "proportional to the value of the thing taxed." Black's Law Dictionary 53 (7th ed. 1999).

receive $5,000.00 one year and you're expecting to receive that for an additional five or six years, what is that worth today? So that's all we're trying to do as far as valuing an income stream. It's not a severance tax. It's just saying that if you have two exact properties and both were up for sale, you know, what would you prefer to have, one that you're going to receive a royalty check for the next duration period of time or would you rather have the other one that you don't have a known reserve?

We're very conservative whenever we make all these estimates. On coal, we receive the Office of Surface Mining Permit which has not only reserve studies, but they have projections on what they're to receive each year. We look at that. We only put an economic life up to their legal use. In other words, if that permit even said that they had a 20-year life on it, they don't have a legal use to permit it for 20 years. They only give a five-year permit; so we're very conservative on coal by using only that legal use of the property.

On oil and gas, there is no reserve studies. It's kind of a run-by-wildcat operation. It's a lot simpler for them to go out and do a test hold just to tap and see if there's any oil and gas. Even if there were reserve studies, it's very unreliable. I mean, you know, you may do different kinds of tests to try to find out what kind of oil and gas you have down there, but it doesn't mean it's feasible to get out. So we have a very conservative approach with that.

In 2014, the Division had a meeting with several members of the oil and gas members. There were attorneys, purchasers, producers. We had a meeting with them and they had the same thought process on why we use a five-year life and we don't reduce it each and every year, we just keep the five.

On cross-examination, Gibson testified as follows:

Q. So when you are taking the estimate of cash value annually of oil and gas reserves in the ground, that's just pure speculation, is it not?
A. Repeat the question.
Q. You don't have any idea what the reserves are that you're talking about, do you?
A. The remaining reserves?
Q. Yes, sir.
A. No, sir. We do not have a reserve study to follow.
Q. And the manuals don't allow you to assess based on speculation, do they?

A. The Mineral Manual that we have in this section details different observations that you have to make; so I feel like I've applied everything that I can. Yes, sir.

Q. Well, what have you applied? What have you done to determine the mineral reserves?

A. There's nothing that I can do without a mineral reserve study; so I guess I did everything that I could do to make an assumption, which you make assumptions all the time in an appraisal.

In June 2015, the Appeals Commission issued its final decision and order wherein it reinstated the original assessments. In its final decision and order, the Appeals Commission stated in part:

The tax here was duly levied by the counties as an ad valorem tax based on the determined value of the property, and demonstrated error in the value determination does not convert the levy to another form of tax. The boards of equalization may reject the value as unduly speculative, or just plain wrong, but the boards do not thereby avoid their duty to determine value using the most persuasive evidence available. In this case, as in the coal cases decided in years past, the only evidence came from the assessing authority. The owner of the mineral interest offered no measure of actual depletion for these properties, in fact no evidence at all pertinent to the properties' value.

The assessors offered the testimony of Keith Gibson, a staff appraiser employed by the Tennessee Division of Property Assessments, who explained there were no reserve studies available to the Division or taxing authorities, just annual data on production for oil and gas. He stated the implicit assumption of a five year remaining life for these interests is conservative based on their historic production which typically exceeds five years. Projecting the coming year production will equal the prior year is a neutral assumption, not unlike any income projection for commercial properties, and the assessor invites more accurate information from the property owners who are better positioned to estimate future production. Lacking more accurate information would not excuse the assessor from the responsibility of assessing the contributory value of proven mineral reserves.

Disproving the assessors' assumptions, or raising the likelihood that a more accurate value is possible, did not render the tax levy void, and did not meet the property owner's burden to establish a more credible value. Accordingly, the Commission finds and concludes the original assessments

for these properties should be reinstated subject to the owners' rights of further appeal.

In September 2015, Coal Creek filed a complaint in the Trial Court seeking judicial review of the Appeals Commission's decision. This matter was tried in January 2017. William S. Lyon, III ("Lyon"), executive vice president for Coal Creek, testified. Lyon testified, in pertinent part, as follows:

Q. When did -- well, how much property does The Coal Creek Company own and where is it located?
A. We own 72,000 acres across four counties, being Campbell, Morgan, Anderson, and Blount.
Q. And where are the majority of the gas and oil operations located?
A. Anderson County.
Q. And when was the first time that you, on behalf of The Coal Creek Company, became aware of the taxation of these mineral interests that we've been talking about here today?
A. 2009.
Q. And how did that -- how did you become aware of that taxation?
A. Well, we received tax notices that -- in the past, we always received tax notices on the value of the land. And then in 2009, there was a tax notice on the mineral interests.
Q. Was it a separate tax notice?
A. Yes.
Q. Did the valuation of the land change in regard to -- well, did the valuation of the land change when you started receiving these separate mineral notices?
A. No. It probably increased just a tad because of the reappraisal period, but no appreciable change.
Q. And has the same process been followed from 2009 through 2016?
A. Yes.
Q. Have you had any conversations with any of the assessors for Morgan, Campbell, or Anderson counties regarding any sort of allocation of how these taxes are allocated across the various parcels of property?
A. No.
Q. Have you received any information from the counties that there is any sort of allocation?
A. No, I have not.
Q. Okay. When you first began -- well, when was the -- when was the last time an oil or gas well was dug on any of Coal Creek's property?
A. It would probably be early 2009.

Q. And how many oil and gas lessees are there?
A. Three.
Q. And have there generally always been three?
A. Since I've been there, just three.
Q. And who are those three?
A. Knoxville Energy, Atlas America, and Vinland Energy.
Q. How many -- beginning back in 2009 when this taxation process started, how many oil and gas wells were in existence and operating on Coal Creek property?
A. There was approximately 414.  Approximately.
Q. And how many are there today?
A. There are 344.
Q. Have any of the operators gone out of business or restructured, as far as you know?
A. Yes, two of our lessees have gone through bankruptcy in the last two years.
Q. And who were those?
A. Atlas and Vineyard.
Q. Now, at the time these assessments began or prior to the time these assessments on the oil and gas minerals started, did anyone from the State or any of the counties contact you on behalf of Coal Creek to get any information?
A. No.
Q. Does Coal Creek maintain information on the production of oil and gas wells?
A. Yes.
Q. And what records are maintained?
A. We get a monthly royalty report from each lessee.  And we post those by month, by well, to production schedules, and we keep those up to date.

***

Q. Based on your knowledge of the production records of the oil and gas wells on the property, did the production vary from year to year?
A. Yes.
Q. Are the variations large, small?
A. Well, some of them are pretty large.  For example, the oil production for 2015, compared to 2016, decreased on one lessee by 60 percent and on another lessee it decreased by 30 percent.
    The gas has a smaller decline rate.  It decreased on one lessee 16 percent from '16 to '15 and 10 percent on another one from '16 to '15.

Q. Based on your knowledge of the production records from Coal Creek, would production from a prior year be a reasonable indicator of production for the subsequent year?
A. I don't believe so. It's so -- it's so up and down that I don't think it'd be a reasonable estimate.
Q. Does Coal Creek have any reserve studies of oil and gas deposits on its property?
A. No.
Q. Has Coal Creek ever received any information regarding reserve studies that may have been conducted?
A. I have not seen any.
Q. Are you aware of any methodology for determining the amount of oil or gas deposits that may be contained in underlying fee property?
A. No.
Q. Did Coal Creek keep on its books or any of its records a valuation of the oil and gas mineral interests existing on its properties?
A. No.
Q. Has it ever?
A. Not to my knowledge. And I've been here ten years, and I have not seen a segregation of that asset.

On cross-examination, Lyon testified as follows:

Q. Mr. Lyon, you are a CPA by trade; is that correct?
A. Yes.
Q. And in your professional practice you're familiar with the use of the income method for value for leases, for example?
A. Yes.
Q. So you understand that that is in fact a standard method, acceptable method, by which valuations are done?
A. Yes.

***

Q. All right. And finally, have you -- have you ever taken any information to the Campbell County Property Assessor's Office which you asked -- in which you were asking them to consider making an adjustment in the mineral valuation of the Campbell County part of the property?
A. No, I've never taken any production information or anything. The only thing I have done is appear before the Board of Equalization and put forth our appeal as to severance tax and the apportionment factor.

-8-

Q. And I want to be clear about what I'm asking you here. You understand that at any time you can take information to a property assessor's office?
A. I understand that.
Q. Have you ever done that as far as the Campbell County Property Assessor's Office, asking for an adjustment to be made?
A. No.
Q. And never provided them with any further information?
A. No, I have not.

***

THE COURT: Let me ask before you step down, Mr. Lyon. Have you provided any information to any of the counties involved in this case, the Boards of Equalization, for an adjustment on the tax?
THE WITNESS: No, I have not.

In February 2017, the Trial Court entered its detailed final judgment in which it dismissed Coal Creek's complaint. The Trial Court found that Coal Creek failed to meet its burden of proof, stating as follows:

This case is before the Court on the complaint of The Coal Creek Company ("taxpayer") for judicial review of a decision from the Tennessee State Board of Equalization and Tennessee Assessment Appeals Commission (collectively "the Board"), reversing the decision of the Administrative Law Judge and reinstating the valuations and assessments of the property assessors for the Tennessee counties of Anderson, Campbell, and Morgan. The complaint addresses the values and assessments for the oil and gas reserves owned by the taxpayer in its real property. The taxpayer argues that the income approach utilized by the assessors results in an additional severance tax in violation of Tenn. Code Ann. § 60-1-301; that the taxation, as industrial and commercial, of the oil and gas reserves (mineral interests) was not apportioned with the taxation, as farmland, of the surface of the property in violation of Tenn. Code Ann. § 67-5-801(b); and that any attempted apportionment would further violate Tenn. Code Ann. § 67-5-801(b) because the State Board of Equalization had never established guidelines, for apportionment, as mandated by Tenn. Code Ann. § 67-5-801(b).

The taxpayer has not produced any proof regarding the value of its oil and gas interests or its fee interests. The taxpayer has instead pointed out deficiencies in the income-approach used by the assessors and that the surface land and mineral interests assessments have not been apportioned.

-9-

The taxpayer has presented no evidence to support any alternative value or any alternative apportionment.

The taxpayer's lack of proof is problematic for its case. The Court agrees with the Board's pretrial brief filed January 23, 2017:

> In accordance with the foregoing authorities, the taxpayer bears the burden of proving that the tax assessments are erroneous. *Dooley*, 2013 WL 179962, at * 5, *Spring Hill*, 2003 WL 23099679, at *5 (citing *Edmondson Mgmt. Serv., Inc. v. Woods*, 603 S.W.2d 716, 717 (Tenn. 1980)). The taxpayer cannot meet this burden merely by criticizing the taxing authority's method of assessment or computation of tax amounts. *Edmondson*, 603 S.W.2d at 718. To meet its burden, the taxpayer additionally must offer "evidence of the amount of taxes owed." *Id*.
>
> As the Supreme Court explained in *Edmondson*, "[v]ague allegations by the taxpayer to the effect that the . . . method of ascertaining the taxes due from him was incorrect are not sufficient to carry the taxpayer's burden." *Id*. In upholding the assessment in that case, the Court reasoned that
>
>> [the taxpayer] has failed to produce an audit, actual books and records, or summaries thereof, or other evidence to establish that it owes less taxes than the amount assessed by the Department of Revenue. The taxpayer has done no more than to make allegations to the effect that the State's audit method was incorrect, inapplicable or constitutes only an estimate; this is wholly insufficient to support a judgment in favor of the taxpayer.
>
> *Id*.
>
> In this case, Coal Creek elected not to present any proof regarding the value of its oil and gas interests. (A.R. I, 93). Instead, Coal Creek focused its efforts on criticizing the methodology used by the Assessors and DPA [Tennessee Division of Property Assessments] to value the interests. (A.R. I, 63-88). Coal Creek suggested that the Assessors

should have used the comparable sales (market) approach, but it presented no evidence that would have supported any type of valuation using this approach. (A.R. I, 63 & 93). And it criticized the speculative nature of the DPA's valuation of the interests using the income approach and, in particular, the DPA's assumption of a five year well life, but it presented no evidence as to the average life of Coal Creek's wells, and it presented no evidence to support an alternative value using either the income approach or any other approach. (A.R. I, 83 & 93).

STATE BOARD OF EQUALIZATION'S AND ASSESSMENT APPEALS COMMISSION'S PRE-TRIAL BRIEF IN OPPOSITION TO PLAINTIFF'S COMPLAINT SEEKING JUDICIAL REVIEW, pp. 12-13.

The Board's above comments relate to the proceedings before it; however, the same comments apply to the proceeding before this Court. The taxpayer put forth no alternative valuation or apportionment before the Board or this Court.

The context of a case involving ad valorem assessments of property containing mineral interests is set out in *Richardson v. Assessment Appeals Com'n*, 828 S.W.2d 403 (Tenn. Ct. App. 1991). The Court of Appeals states:

> As observed by appellant's counsel, a brief statement regarding ad valorem assessments of property containing mineral reserves is helpful in order to put the issues at hand in perspective. Generally, for purposes of tax appraisal, assessments are made differently on real property owned in fee and having mineral content. Separate assessments are made for the "surface" values of the property and the "mineral" values of the property. In keeping with the Constitution of The State, the surface assessment, as noncommercial property, is twenty-five percent of the fair market value and the underlying mineral is assessed at forty percent of the fair market value as commercial property. Generally stated, surface values are to be established pursuant to T.C.A § 67-5-601, et seq.
>
> T.C.A. § 67-5-601(a) and T.C.A. § 67-5-602 provide respectively in pertinent part as follows:

67-5-601. General Policy.—(a) The value of all property shall be ascertained from the evidence of its sound, intrinsic and immediate value, for purposes of sale between a willing seller and a willing buyer without consideration of speculative values ...

67-5-602. Assessment guided by manuals— Factors for consideration.—(a)   ...   in determining the value of all property of every kind, the assessor shall be guided by, and follow the instructions of the appropriate assessment manuals issued by the division of property assessments and approved by the state board of equalization.....

(b) For determining the value of real property, such manuals shall provide for consideration of the following factors:

***

(7) Natural productivity of the soil, except that the value of growing crops shall not be added to the value of the land. As used in this subdivision, "crops" include trees; and ...

[3] Thus, in general terms, surface values are determined without regard to mineral value and without regard to the value of growing crops, which by statutory mandate, include trees. The mineral value must then be determined and the surface value must, then, in order to obtain true equalization, be further reduced by the value of the underlying minerals. Common sense dictates that, under ordinary circumstances, the combined market value of the surface and underlying minerals do not and cannot exceed the market value of the fee.

*Richardson*, at 407.

The taxpayer provided no alternative values whatsoever for its mineral interests. Even on its original appeal forms to the State Board of

Equalization, the taxpayer conspicuously failed to complete the sections of the forms asking for the taxpayer's belief as to the fair market value of the property (mineral interests). The Court is unable to find that the assessors' use of the discounted income approach has resulted in any erroneous valuations or that a different valuation would be correct. As to apportionment, in addition to producing no evidence as to the value of the mineral interests, the taxpayer gave no value on its appeal forms for the fee and presented no evidence as to the value of the fee (the value of the land with consideration of the mineral interests). The taxpayer has raised no issue as to the assessors' valuation of its surface land. The assessor valued the taxpayer's surface land without consideration of the mineral interests. The taxpayer produced no evidence of the value of its mineral interests or the fee.

The "property appealed" is only the taxpayer's mineral interests. In completing portions of the appeal forms to the Board, the taxpayer gave information from the assessors' records as to the assessors' valuations of the taxpayer's mineral interests and surface land. The taxpayer also attached various property tax notices and records from the assessors. However, as mentioned above, the taxpayer gave no value for the taxpayer's mineral interests or fee. The taxpayer produced no such evidence, and the record is devoid of any evidence whatsoever as to the value of the fee. With no evidence produced as to the value of the fee, the Court cannot determine that the apportionment made is inaccurate or that the assessors' values for the mineral interests and surface land exceed the value of the fee.

Finally, the taxation, at issue in this case, is not a tax on oil and gas removed from land owned by the taxpayer, but upon the oil and gas remaining in the land. The use of the discounted income approach, which utilizes the prior year's production as a measure of income, does not transform the tax from an ad valorem tax upon the oil and gas reserves remaining in the property. The prohibition against an additional severance tax, in Tenn. Code Ann. § 60-1-301, does not apply to taxes upon the oil and gas reserves remaining but only to the oil and gas removed. The tax imposed in this case is not for the same year as the severance tax imposed upon the oil and gas removed but for the next year upon the oil and gas reserves remaining. The taxpayer produced no evidence to show that any different amount of tax would result from using a different methodology as opposed to the discounted income approach used by the assessors in this case. Likewise, as with methodology, the taxpayer has failed to show that the imposition of formal guidelines would result in any different valuation or apportionment.

-13-

The taxpayer has failed to meet its burden of proof in this case. The complaint will be dismissed with the costs taxed to the plaintiff taxpayer.

Coal Creek timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Coal Creek raises one issue on appeal: whether the Trial Court erred in dismissing Coal Creek's complaint for failure to meet its burden of proof.

"[J]udicial review of a Board of Equalization decision clearly falls under the Uniform Administrative Procedures Act ("UAPA") . . . courts are to apply the narrow, statutorily defined standard contained in [Tenn. Code Ann.] § 4-5-322(h) rather than the broad standard of review used in other civil appeals." *Spring Hill, L.P. v. Tennessee State Bd. of Equalization*, No. M2001-02683-COA-R3-CV, 2003 WL 23099679, at *4 (Tenn. Ct. App. Dec. 31, 2003), *no appl. perm. appeal filed* (citations and quotation marks omitted). We review the trial court's factual findings *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Richardson v. Assessment Appeals Com'n*, 828 S.W.2d 403, 407 (Tenn. Ct. App. 1991). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Id*. Tenn. Code Ann. § 4-5-322(h) (2015) states, in relevant part, that a court reviewing the board's decision may:

> reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

"Upon appeal of a decision taken by an administrative agency following a contested case proceeding, the standard of review in this court is the same as it is in the chancery court." *Terminix Intern. Co., L.P. v. Tennessee Dept. of Labor*, 77 S.W.3d 185, 191 (Tenn. Ct. App. 2001).

This case touches, in part, upon appraisal methodology. There are at least "three generally recognized approaches: the comparable sales approach, income approach, and cost approach." *Knoxville Community Development Corp. v. Bailey*, No. E2004-01659-COA-R3-CV, 2005 WL 1457750, at *2 (Tenn. Ct. App. June 21, 2005), *no appl. perm. appeal filed*. The Assessors in the present case utilized the income approach, which has been described as follows:

[T]he "income approach" appraisal method . . . is designed to determine the value of income-producing property by reducing to present value the anticipated future net earnings stream of the property. The income approach begins with a calculation of gross income. This gross income figure is then reduced by expenses. The resulting net income figure is then capitalized at an appropriate rate to arrive at the value of the income-producing property.

*Seaton v. State Bd. of Equalization*, No. E1998-00880-COA-R3-CV, 2000 WL 852123, at *1 (Tenn. Ct. App. June 28, 2000), *Rule 11 perm. app. denied Feb 20, 2001*. (Footnote omitted).

"[T]he burden is on the taxpayer to prove that [tax assessments] are erroneous." *Edmondson Mgmt. Serv., Inc. v. Woods*, 603 S.W.2d 716, 717 (Tenn. 1980) (quoting *Howard v. United States*, 566 S.W.2d 521, 528 (Tenn. 1978)). On the other hand, "[t]axation statutes must be liberally construed in favor of the taxpayer and strictly construed against the taxing authority." *Covington Pike Toyota, Inc. v. Cardwell*, 829 S.W.2d 132, 135 (Tenn. 1992). Article II, § 28 of the Tennessee Constitution provides for the classification and taxing of property as follows:

In accordance with the following provisions, all property real, personal or mixed shall be subject to taxation, but the Legislature may except such as may be held by the State, by Counties, Cities or Towns, and used exclusively for public or corporation purposes, and such as may be held and

used for purposes purely religious, charitable, scientific, literary or educational, and shall except the direct product of the soil in the hands of the producer, and his immediate vendee, and the entire amount of money deposited in an individual's personal or family checking or savings accounts. For purposes of taxation, property shall be classified into three classes, to wit: Real Property, Tangible Personal Property and Intangible Personal Property.

Real Property shall be classified into four (4) subclassifications and assessed as follows:

(a) Public Utility Property, to be assessed at fifty-five (55%) percent of its value;

(b) Industrial and Commercial Property, to be assessed at forty (40%) percent of its value;

(c) Residential Property, to be assessed at twenty-five (25%) percent of its value, provided that residential property containing two (2) or more rental units is hereby defined as industrial and commercial property; and

(d) Farm Property, to be assessed at twenty-five (25%) percent of its value.

Tenn. Code Ann. § 60-1-301 provides for a severance tax on oil and gas removed from the ground in Tennessee:

(a) There is levied a severance tax on all gas and oil removed from the ground in Tennessee. The measure of the tax for such gas and oil shall be three percent (3%) of the sale price of such gas and oil. Every person actually engaged in severing oil or gas, or actually operating oil or gas property under contracts or agreements requiring direct payments to the owners of any royalty interest, excess royalty or working interest, either in money or otherwise, shall be liable for the tax imposed by this section and shall, prior to making any such payments, withhold from any quantity or amount due the amount of tax due pursuant to this section.

(b) The tax shall be levied for the use and benefit of the state, as well as the county governments and one third ( 1/3 ) of all revenues collected from the tax shall be allocated to the county which was the site of the wellhead for that gas or oil. The remaining two thirds ( 2/3 ) of such revenues shall be

deposited to the credit of the state treasurer as a part of the general funds of the state.

(c) No other tax shall be imposed on such gas and oil by the state, counties or any other political subdivision of the state; provided, however, that:

(1) Free gas used by the property owner or tenant under the terms of the lease, unless it be in lieu of cash payment; and

(2) Gas which has been injected into the ground for underground storage and thereafter withdrawn shall not be subject to this, or any taxation.

Tenn. Code. Ann. § 60-1-301 (2013). Regarding classification of property according to use for tax purposes, Tenn. Code Ann. § 67-5-801 provides:

(a) For the purposes of taxation, all real property, except vacant or unused property or property held for use, shall be classified according to use and assessed as provided in this section:

(1) Public Utility Property. Public utility property shall be assessed at fifty-five percent (55%) of its value;

(2) Industrial and Commercial Property. Industrial and commercial property shall be assessed at forty percent (40%) of its value;

(3) Residential Property. Residential property shall be assessed at twenty-five percent (25%) of its value; and

(4) Farm Property. Farm property shall be assessed at twenty-five percent (25%) of its value.

(b) Where a parcel of real property is used for more than one (1) purpose, which would result in different subclassifications and different assessment percentages, then it shall be apportioned among the subclasses according to guidelines established by rules and regulations of the state board of equalization.

Tenn. Code Ann. § 67-5-801 (a)-(b)(2013).

Coal Creek argues on appeal that the tax assessments on its mineral interest constitute an unlawful additional severance tax above what is provided for exclusively by

Tenn. Code Ann. § 60-1-301.  Coal Creek argues further that the Board of Equalization's failure to promulgate and abide by guidelines as contemplated by Tenn. Code Ann. § 67-5-801 precludes the "layering" of taxes on Coal Creek's property according to different uses.

It is undisputed that Coal Creek's property contains oil and gas deposits which, when extracted, produce income for the company.  It is a logical and unsurprising proposition that a property producing a stream of income—in this case from oil and gas—is more valuable than an otherwise comparable property that cannot provide any such income stream.  Even though reserve studies as to the gas and oil are not available, the Assessors did not have to blind themselves to the reality of the property's use.  The Tennessee Constitution provides for the classification of property and levying of tax according to use.  It is clear from the record that Coal Creek's property is not merely farm land, however long previously it had been classified solely as such.

The tax assessments at issue are on oil and gas remaining in the ground.  A severance tax, by contrast, taxes those minerals that are extracted.  Accounting for and taxing the value of the oil and gas deposits on Coal Creek's property is not identical to imposing an unlawful additional severance tax.

Coal Creeks points to the lack of guidelines contemplated by Tenn. Code Ann. § 67-5-801.  We do not know why the Board has failed, at least as of the disposition of this case below, to promulgate guidelines regarding apportionment and sub-classifications. However, we do not believe that failure to promulgate guidelines to date means the Assessors were required to ignore the fact that Coal Creek's property contains oil and gas deposits that produce a stream of income for the company, a relevant consideration in valuation.  Under the Tennessee Constitution, Coal Creek's property, including its mineral interest, is subject to taxation.  The Assessors in this case went about appraising the mineral interest of the property using a method they regarded as appropriate, even "conservative" vis-à-vis Coal Creek's interests.  In the absence of guidelines, we find that the Assessors sufficiently exercised their duty under the Tennessee Constitution and other applicable law.[2]

The Assessors utilized the income approach appraisal method.  The evidence in the record reflects that the income approach is a viable and widely accepted means of arriving at value, depending upon the circumstances.  Tennessee case law also supports this proposition.  Coal Creek asserts that the Assessors did not correctly perform an

---

[2] Under the facts of the present case, we find that the classifications and tax assessments at issue were rendered properly notwithstanding the absence of formal guidelines.  The better practice, and one likely to reduce or eliminate similar questions going forward, would be for the State Board of Equalization to establish formal guidelines by rules and regulations as contemplated by statute.

income approach appraisal method because no reliable studies are available to establish the oil and gas reserves. Nevertheless, again, in our judgment, this does not relieve Coal Creek from being subject to taxation of its mineral interest. It is undisputed that the property contains oil and gas deposits and that these produce a stream of income for Coal Creek. Coal Creek's position appears to be that, because production varies from year to year and no reserve studies are available, the Assessors have no available means of valuing the mineral interest, and therefore its mineral interest is immune from property taxation. For the reasons already discussed, we disagree and instead agree with the Trial Court.

Lastly, there is the issue of Coal Creek's failure to put forward an alternative value for the mineral interest. As found by the Trial Court, Coal Creek produced no "evidence whatsoever as to the value of the fee [including the mineral interests]." Instead, Coal Creek argues that "the assessments at issue are legally invalid on their face" and "Coal Creek should not be charged with the burden of proving what essentially is a double negative. . . ." We already have rejected Coal Creek's argument that the tax assessments were invalid on their face. With the tax assessments not being invalid on their face and Coal Creek having produced no evidence as to the value of its mineral interests, there is no basis under our standard of review to modify the assessors' values.

We find and hold, as did the Trial Court, that the Appeals Commission's decision to reinstate the original assessments is supported by substantial and material evidence, and we find no other basis under the applicable standard of review to reverse or modify the Appeals Commission's decision. We affirm the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for assessment of the costs below. The costs on appeal are assessed against the Appellant, The Coal Creek Company, and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE